Page number 173863, Medical Center at Elizabeth Place, LLC v. Atrium Health Systems, et al. Argument not to exceed 15 minutes per side. Mr. Ripley, you may proceed for the appellant. Thank you. May it please the Court, I reserve three minutes for rebuttal. My name is Richard Ripley, and I am counsel for the appellant, the Medical Center at Elizabeth Place, or MCEP. What brings us here today is the question of whether the defendant's conspiracy should be condemned as per se illegal under Section 1 of the Sherman Act. Now, our national economic policy favors a competitive market in which individual entrepreneurs are free to make their own decisions. The Supreme Court has, in interpreting the Sherman Act, the central legislative expression of that policy, has held that there are certain categories of conduct that are so antithetical to that principle that they are to be condemned as illegal without consideration to their effect in the market. One of those categories is what's called the paradigmatic group boycott. A paradigmatic group boycott is a conspiracy that denies a firm access to a necessary supply or market, and the conspiracy involves two things. First, it generally involves two or more levels of competition, and it involves horizontal action at at least one of those levels. It involves the firm's rivals, the firm's customers, or the firm's suppliers. This is a paradigmatic group boycott. MCEP's claim does not ask this Court to expand the categories of per se illegal conduct. So I was a little unclear about what – is your position that, separate and apart from these statements and the evictions and all the rest of it, that if you just look at the documents and contracts themselves, they are per se illegal? Yes. Our per se illegal conspiracy is the defendants conspired among each other. And in MCEP 1, the Court said that the jury gets to decide whether they're multiple actors or a single entity. So for purposes of this appeal, they are multiple actors. They conspired with each other to oppose the entry of my client. They achieved that in multiple ways, but two purposes for this is that they got the insurance companies, who are called the payers, to agree not to contract with MCEP. They also got the payers to agree among themselves to hold the line on those commitments. And our papers explain why it's necessary to have that hold the line. They also conspired with independent doctors to deny patient referrals to anybody associated with my client's hospital. That is the paradigmatic group boycott. There is horizontal action both… Would this case come out the same way had they all just merged? Yes. So they're not a joint venture? Everything would be the same? Yes. Be able to say rule, everything? Your argument wouldn't change one bit had they all merged? The only thing that we wouldn't have is we wouldn't have an argument over the ancillary restraint doctrine, right? Wouldn't it be a single entity? But what we would have here, Your Honor, is what was lacking in total benefits versus Anthem, which was this court's decision in 2008, where they say, okay, you have a hub. You have a single actor at the hub. You have multiple vertical restraints, but you have no rim. You have no agreement among the other parties to the spokes. Here, the hub is the defendants. Let's assume that they merged. Let's assume that they're Kettering, who is merged, their parent subsidiaries. They have commitments from every one of the payers not to do business with us. We have evidence that they facilitated an agreement. We have evidence of the rim. That gives you the horizontal conduct at one level of competition. Our mutual customers, the insurance companies. So if they were merged, the evidence demonstrates that this would be like the total benefits Anthem case, only we have a rim. And this court said if the plaintiff there had had a rim, it would be per se, but they don't. But don't cases now say that when you look at these situations with the, well, they say joint ventures, but in these contract situations that you apply a rule of reason? Let me think if I can. I understand that in this fact situation, you folks came along and the defendants made threats and promises and all the rest of it. But let's say you didn't have these discussions and you didn't have these threats and all that happened is that the contracts that were already in effect just got played out. So in our briefs at pages 11 to 15 and then at page 17, we have specific commitments from the payers. Aetna, I will not add, expressed in an email, I will not add MCEP to my network. Humana, I will not add MCEP to my network. Cigna, I want to add MCEP to my network. The defendants say no, they don't. Anthem had an agreement not to add us as a quid pro quo for a most favored nations clause that they got. United tells us we can add you if Anthem can add you. Those are not the contract. That is expressed. If you say that my case doesn't have those, then we would have a different argument as to why it's per se. But we think that this is one of the problems that Judge Rice had. He identified the wrong restraint at play. He said it was this rate for volume, which no one has really ever defined below, because there's no rate for volume. Volume discounts happen a lot, and they often are in connection with exclusive dealing. And that often, not always, benefits consumers. That's why the rule of reason so often applies. You're trying to figure out what really happens. Right, but what we have here is not an exclusive deal. We don't have a network where it's only defendants' conduct. It's the defendants. It's six hospitals from their biggest rival, Kettering. It's children's hospitals. It's everybody but us. It's not a narrow network. It's every bed in Dayton, Ohio, every hospital bed, except the 26 beds that my client had. That's not an exclusive deal. And is there evidence that they were colluding with Kettering? No, there's no evidence of that. I'm sorry, Judge Sutton, I just wanted to make clear that this is not an exclusive dealing case. And so all the pro-competitive arguments for why you have an exclusive dealing don't apply here. And to get back to your question, Judge Wright, if all we had was the panel limitations, which is a contract provision that says if you add a single hospital, then we can terminate this contract. Then you'd have to look at the evidence of how the payers viewed that as a bar. They viewed that as because the defendants, the record shows, had between 56 and 58 percent of the market during this time period. Each of these payers viewed them as a must-have. I have to have them in my network. So then you have to look at the testimony, which we elicited from them, that they viewed this as a bar. Cigna, in its own email, says, we can't add a hospital unless the defendants approve it. Just to make sure I'm getting this case, when I asked you before, had there been a complete merger, it really wouldn't have changed how this case should work from your perspective? Correct. Because you would have said there's still a group boycott and so forth. Just help me out a little bit. If there had been a complete merger, though, you would agree there was a single entity, but you would then say you still have group boycotts through the single entity? Is that the point you're making? Yes. Just so you hear why I'm asking the question. I'm a little skeptical of the panel's decision the first time around, and I feel like we're trying to shoehorn things into what I'm not sure really made a lot of sense. Law of the case horizontally, law of the case is still open. Just as it was open with Judge Rice vis-à-vis Judge Black, it's open here. So I'm asking you, would you be prejudiced? Are your arguments prejudiced? If we say we really think this should be treated as a single entity, now we'll address everything else you have to say? Or is that really hurtful to you? Well, it's hurtful to us. It doesn't affect our claim because we are – I'm just trying to figure out. You said if they merged, it would have been the same way. And if they'd merged, surely it would have been a single entity. That takes off the prior panel's decision. That's all they said. So then what am I missing? I must be missing something. No, I'll address why it's hurtful to us. We pled a per se claim only because we had evidence to demonstrate that the defendants were competitors. We pled that theory. And Judge Black, in 2014, said you've pled a proper theory. If these four get together and they boycott with others, that's per se. If they were a single entity, if he had said no, I think as a matter of law they're a single entity, we would have had the opportunity then to say, okay, you know what, then perhaps we need to plead both a per se and a rule of reason because we have the per se to cover the payer, the rim, but we didn't have that. Our theory was justified by Judge Black. We built our record on that. We got this court in MCP1 to affirm that it's a question for the jury. If the jury decides and agrees with the defendants that they're a single entity, then they can't be the horizontal action that entitles us to per se. That would leave us with the payer agreement, the rim, which we say Judge Rice improperly excluded. It was pled, and that's paragraph 88 of our amended complaint. We say that the defendants orchestrated group boycotts, plural, and in paragraph 74A we specifically identify every payer by name that they boycotted with, and they entered into agreements with them not to do business with our client. So we pled it. It was new evidence. It wasn't new evidence. It was not a new claim. It was evidence of that claim, Your Honor. So Judge Sutton, we think that we would be prejudiced if this panel decided to abandon MCP1 because we built our case relying on that this was going to be a per se. But even if we do that, we still have the rim. It worked so well the first time in front of the district court, that argument, because Judge Black thought it was a single entity. He did, but this court corrected him. Judge Black thought that… No, but this is the point about the amendment. You had time then to amend it. That's the point I'm making. At summary judgment? After he said, I think it's a single entity. Why wouldn't you ask for leave to amend then? As opposed to appealing it? Do both. Well, discovery was closed. We had built the record. We hadn't identified experts, but we thought that he was wrong, and this court agreed with us in MCP1 that they were wrong. That is a jury question.  Judge Rice's decision that plausible justifications always come into consideration on group boycotts repudiates 75 years of Supreme Court authority on this issue, and an affirmance of that would endorse that repudiation. If there's no other questions, I've saved the rest of my time. Thank you. Good morning, Your Honors. May it please the Court. I'm Shai Foretsky, representing the Appellees. Plaintiff made a critical strategic choice at the outset of this case to assert only a per se claim, and as a consequence, the plaintiff has to show that Premier's conduct here clearly falls within the very limited and narrowly defined category of per se illegal activity. That's a very steep hill to climb, surely if we were dealing with a single entity, but also in the context of a legitimate joint venture. Again, the ultimate legality of the conduct at issue here is not the issue before this Court. The question is whether the plaintiff has pled conduct that can be treated as per se illegal, and the Supreme Court's decision in Dogger addresses how the conduct of a legitimate joint venture is to be addressed. The plaintiff here doesn't challenge the legitimacy of the joint venture, doesn't question that it's a legitimate joint venture with pro-competitive justifications. And in that context, the Supreme Court has instructed to consider whether a challenged restraint is either core activity of the joint venture, that is, is it integral to the running of the joint venture, or whether it's an ancillary restraint, which is to say whether there is a plausible pro-competitive justification for it. But doesn't Dogger mention several times that that involved a single entity? No. In fact, in footnote one of Dogger, the Supreme Court said that it was not considering the single entity question. But what the Supreme Court did say in Dogger... Why are you using that phrase? Because once you have a legitimate joint venture, once that's either established or conceded,  is treated like a single entity, rather than like a series of competitors. Is there some underlying in this case where we have this prior decision that says there's a fact dispute about whether it's, quote, a single entity? Well, the test for whether something is a single entity is different than the test for whether it's a legitimate joint venture. So I certainly agree with you that we should have prevailed in the first appeal and that this entity here satisfies the test for a single entity. The test for that under Copperweld, under American Needle, do you have unitary decision-making? Is there a single center of decision-making or are there independent centers of decision-making? It was decided that there was a genuine issue about whether this was a single entity. The earlier panel decision held that there was a tribal question about that, but not about the separate question of whether it's a legitimate joint venture. First, the plaintiff isn't challenging that, has never contested that. And second, it's a separate test. The question whether it's a legitimate joint venture is whether it is an integration of resources for a pro-competitive purpose. And the Supreme Court in Dogger, in footnote one, said it wasn't addressing the single entity issue. And as for the joint venture question, while the legitimacy of a joint venture could be challenged under the rule of reason, in Dogger the plaintiffs hadn't asserted that challenge and neither does the plaintiff here. Once you have what is a... I'm sorry. No, no, please. In Dogger, it was clear that the two companies were acting as one company in that market. I mean, that was sort of the basis of the whole decision. That they had formed a new entity and they were operating that as one and they weren't competing in that market. And in the first round of this case, all of those issues were subject to question. I mean, when you read the first opinion in this case and the case you're trying to rely on, they seem like two completely different types of cases. So, again, I think in the first case, in the first case, the first decision in this case, the court found a genuine issue of fact based on a particular report a consultant had gone in and essentially interviewed the participants in the premier venture about how well the integration was going. And the first panel relied on that to find that there was at least a genuine question about whether the single entity test was satisfied. But the joint venture test is something else. I mean, the Supreme Court in Dogger expressly said that Equion there was not a single entity, but because it was an uncontested joint venture, it was treated as a single entity for purposes of the antitrust laws. And that its conduct would therefore be subject to the rule of reason if a particular restraint was either a core activity integral to the functioning of the joint venture as the rate for volume clauses clearly are here because they go to the pricing of premier's product. Or if you had an ancillary restraint, if there was a plausible pro-competitive justification related to the activity of the joint venture. At a minimum, the rate for volume clauses here satisfy that standard, as do the non-compete clauses and the other restraints that the plaintiff is challenging here. So I don't know if this will help my colleagues, but it will help me. But I'm afraid it's a little clueless. The question, the ancillary restraint doctrine, does that look different when you're applying it to a joint venture from when you're applying it to, quote, a single entity? Is there any... Because I think I'm kind of asking the same question Judge White's asking. You know, we have this, oh, there's a fact dispute, we can't treat it as one. We're going to call it a legitimate joint venture and it looks like there's almost a Venn diagram. The same arguments are being used. And I'm just trying to sort out what the critical distinctions are. And so one way of thinking about it from my perspective is, I understand you're arguing ancillary restraint. I mean, is that even a doctrine that's available for a single entity case? Well, I think if we were dealing with a single entity, then the internal... A single entity is incapable of conspiring with itself. Right. So it just seems like ancillary restraint is a doctrine to use if you fail your single entity argument. And yet it looks like it's a lot of overlapping arguments. Does that make sense why I would say that? Not really. The visual cues are saying not really. Well, I think the awkwardness here, as you pointed out in Mr. Ripley's argument, is that this does look an awful lot like a single entity. The first panel held otherwise. But if we were dealing with a single entity, then you wouldn't have to apply the ancillary restraints doctrine because the components of the single entity aren't capable of conspiring with one another. Buick and Pontiac don't conspire with one another. They're all part of a single entity, which is GM. And we think likewise here. But taking that as precedent, if we're past that, at a minimum, this is a legitimate joint venture. Now, the members of a joint venture could, in theory, violate the antitrust laws by conspiring with one another. But if what they are doing is an ancillary restraint, that is, it has a plausible pro-competitive justification that goes to the purpose of the joint venture, then that's subject to the rule of reason, not the per se rule, which is the only theory that the plaintiff has pled here. So I don't know if that answers your question. I understood that argument before, but I understand why Judge White's asking what she's asking, and I have the same funny reaction to the case. I wish we had it at the first stage. Law of the case, for what it's worth, the way this works is each panel gets to decide whether to hold a case and treat it as a must panel. But technically, law of the case, you can do whatever you want. You can say you have to show clear air before you change your mind at the same level of a case. You obviously can't reverse someone above you. But the next reviewing court never asks whether there was clear air. They just want to know what the right answer was. And I feel like we're looking in the wrong place for the right answer. And, in fact, the plaintiff here filed a motion at the end of the briefing asking for this to be treated as a must panel case, and the court denied that motion. So here we are with a different panel. The panel is, as you suggest, free to revisit the determination in the earlier case, and I think it's a very clean and simple way to resolve this case to say that this is, in fact, a single entity. If you look at the joint operating agreement, it states Premier's overall vision and goals. It grants Premier the authority to manage the hospitals collectively. Section 7 of the joint operating agreement requires revenue pooling and allocation of income according to a set formula across the entire venture or the entire single entity, if you will. And Premier has carried out that integration in its actual operation. I would point you to the argue report, which is in the record at document 190-3. It talks about the various ways in which this integration has been carried out, services have been consolidated, and efficiencies have been gained. What is your answer to their argument that you still have the rim, that even assuming that this is a joint venture, you've still coerced the payers to boycott the plaintiff? So two points. One, as an evidentiary matter, there's no evidence in the record of any direct communication among the insurers. But perhaps more importantly, Judge Rice properly held, certainly didn't abuse his discretion in precluding that claim from trial because it wasn't pled in the complaint. Mr. Ripley pointed to a paragraph of the complaint that alleges orchestrating group boycotts. But if you read the complaint, what that's talking about is the alleged orchestration of a group boycott by the various Premier entities vertically with the insurers. There's no allegation in the complaint of any horizontal agreement involving the insurers or the doctors. And as this Court said in the Superselke case, it's critical when you're alleging a conspiracy and certainly when you're trying to bring a per se claim to specify what the concerted activity is. Who conspired with whom. That is what drives discovery and how these cases are litigated. And that's just not in this complaint. It was enough in the case that it was discussed by the prior panel, wasn't it? It was mentioned in passing that Mr. Ripley had made these arguments, but that was not a basis for the prior panel's decision. The prior panel was quite clear that the only issue it was deciding was in fact whether there was a single entity. And when this case eventually reached Judge Rice and as we approached trial, Judge Rice properly precluded those claims from trial because they weren't alleged in the complaint. They were first raised at the close of discovery. Mr. Ripley, in a deposition, frankly admitted that these allegations are not in the complaint, but are ones that rather arose during discovery. That's at page ID 36, 37, page 55. And under this Court's Superselke decision, that's critical because it's the nature of the horizontal conspiracy that drives the litigation of the case. And to assert that after the close of discovery is simply too late. And Judge Rice properly held that Premier would be prejudiced by at this point allowing these claims to proceed. It would require reopening discovery, involving third parties, the insurers, the doctors. And so these claims were simply not brought in the complaint and were asserted as a factual matter too late in the case. Where in the contracts does it authorize you to evict doctors who did business with the plaintiff? So I think that's referring to the plaintiff's challenge to the non-compete clauses. Premier owned real estate and leased it to doctors, but one of the clauses in those contracts was that the doctors who were leasing Premier's space would not be competing with Premier while doing so. The consequence of that can be eviction. That's simply the enforcement of the non-compete clause. And the non-compete clause is at a minimum an ancillary restraint if we're in the world of a legitimate joint venture. It's an ancillary restraint because it has plausible pro-competitive justifications related to Premier's joint venture. It's protecting Premier's investment in this office space. And so Mr. Ripley is focusing on the quote-unquote eviction, but that's simply an enforcement mechanism for a legitimate non-compete clause in these contracts. The Court has no further questions. We're happy to rest on the arguments in our briefs. I think we do not. Thank you, Counsel. Thank you. Rebuttal? Thank you, Your Honor. I want to address some of the questions that Judge Sutton and Judge White posed. First of all, Judge Sutton, at page 6 of DOGGR, it says, the pricing policy challenge here amounts to little more than price setting by a single entity. He responded, I don't have DOGGR in front of me, but he responded that footnote 1 expressly reserves, I mean, this is the beauty of this case. We can take a phrase and have it mean different things in different contexts. But he says in footnote 1, it reserved the single entity question that was at issue in this case the first time around. So I don't know if you have footnote 1 in front of you. Yes, I do, Your Honor. And footnote 1, there's two ways for us to have attacked the defendant's conduct here. We could have argued that the joint venture was a sham, a complete sham, and that's footnote 1. It says that the petitioners there do not say that it's a sham. So we said, but doing a sham requires... You're not saying that here either. I'm not saying that they're a sham. So we don't have that way to undo to say what they did was wrong. So they're a joint venture. But in DOGGR, it was an integrative joint venture. Shell and Texaco gave up everything upstream from their gas stations. They gave up their trade names to Equiline. They gave up the refining. They gave up their distribution. They put it into one serious JOC, joint operating company, that distilled the petroleum, distributed the petroleum, and set the price. And Justice Thomas says, although that's price-fixing in the literal sense, it's not price-fixing in an antitrust sense. So that was an integrated joint venture. MCEP-1 says, it's for the jury to decide whether this is going to be an integrated joint venture. So DOGGR gives no value to this court's analysis. So what do we do? The Ancillary Restraint Doctrine. The Ancillary Restraint Doctrine is a lifeline for joint ventures. Joint ventures involve collaboration among actual or potential competitors. And so that horizontal action sometimes would involve conduct that would be determined per se illegal. They can avoid that condemnation by showing that the restraint is reasonably necessary, not plausibly necessary, what my defense counsel said. That's what Judge Rice said, plausibly necessary. He picked that out of a handbook by a private practitioner. The case law says reasonably necessary. Then Judge Sotomayor's concurrence, reasonably necessary. The Eleventh Circuit in the FTC v. Shearing Plough case said that that means that the restraint cannot suppress competition more than is necessary than to achieve the objective. That's what happens with a joint venture like this that's not integrated, Your Honor. You look, as were these commitments to exclude my client from the market necessary to achieve a legitimate objective of the joint venture. And Judge Black's, that's an evidentiary proceeding. It's a mixed question of fact and law. Judge Black rightly said the defendants didn't meet their burden. And MCP1 and Judge Black on remand said there is no plausible justification for a joint venture to exclude a competitor. I don't know what you can do with Judge Black's decision, but the question for us is what the right answer is. We just don't look at it as, did Judge Rice correctly decide he was clearly wrong? What do we care? I mean, the question is what the right answer is at our level. And it so happened that Judge Black recused. It's unfortunate, but that has to be the way you look at it. Yes, Your Honor, and the right answer is that under the ancillary restraints the defendants had to demonstrate that a commitment from insurance companies not to contract with our client was necessary for the joint venture to achieve one of its pro-competitive synergies. And they have not articulated a single one. There's no other questions? Thank you for your time, Your Honor. Thank you, counsel. The case will be submitted.